GEORGE HUMFLEET MOBILE HOMES, Appellant,

v.

Dennis CHRISTMAN; Hon. Donna H. Terry, Administrative Law Judge; and Workers' Compensation Board, Appellees.

No. 2003–SC–0047–WC.

Supreme Court of Kentucky.

Jan. 22, 2004.

Bennett Clark, Cart Martin Brashear, Hoskins Law Offices, PLLC, Lexington, Counsel for Appellant.

John E. Anderson, Cole, Cole, Anderson & Nagle, PSC, Barbourville, Counsel for Appellee.

## OPINION OF THE COURT

KRS 342.730(1)(b) bases the calculation of a partial disability benefit on the worker's impairment under the AMA *Guides to the Evaluation of Permanent Impairment* (*Guides*), "latest edition available." Although the claimant's application was filed after the Fifth Edition of the *Guides* was certified as being generally available, the Administrative Law Judge (ALJ) relied upon an impairment that was assigned under the Fourth Edition of the *Guides* when calculating the claimant's income benefit. In a two-to-one decision that was affirmed by the Court of Appeals, the Workers' Compensation Board (Board) remanded the matter and directed the ALJ to rely upon an impairment that was assigned under the Fifth Edition of the *Guides*. Although the basis for our conclusion that a remand is required differs from that of the Court of Appeals, we affirm.

The claimant injured his lower back and neck on January 26, 2000, when he fell from a ladder. He sought treatment in the local emergency room and then with Dr. Adams, his family physician, who ordered a course of physical therapy and medication. Eventually, he was referred to various specialists in orthopedic surgery, neurosurgery, urology, and neurology. Dr. Lester, an orthopedic surgeon, diagnosed cervical and lumbar sprain with possible coccydgodynia. Dr. Einbecker, also an orthopedic surgeon, attributed the shoulder complaints to a C5–6 osteophyte complex. Dr. Kiefer, a neurosurgeon, diagnosed a lower back contusion and aggravation of disc degeneration.

In July, 2000, Dr. Tibbs, a neurosurgeon, performed a cervical diskectomy and fusion to correct severe central canal stenosis and neuroforaminal compromise at C5–6. The claimant later testified that the surgery did not relieve his cervical and upper extremity pain and that his condition worsened. He developed facial numbness, difficulty swallowing, loss of balance, and headaches. A neurologist diagnosed migraine headaches and referred him to a pain management specialist. In November, 2000, the claimant began chiropractic treatment with Dr. Sipple. The ALJ noted, however, that the claimant had previously received regular chiropractic treatment "as part of a periodic health 'tune up' during the preceding 20 years."

On March 1, 2001, the Commissioner of the Department of Workers' Claims certified that the Fifth Edition of the AMA *Guides* was "generally" available. See 803 KAR 25:010E, § 1(9). On August, 1, 2001, the claimant filed an application for benefits. He introduced medical evidence from Dr. Adams and from Dr. Templin, a specialist in occupational medicine and pain management.

Dr. Adams reported that a functional capacity evaluation that was performed in October, 2001, "seems quite adequate and consistent with my interactions with [the claimant]." The physical therapist who performed the evaluation noted that the claimant had "a plethora of complaints," some of which might be magnified in an attempt to get attention. He was of the opinion that the claimant needed additional neurological and orthopedic evaluations to determine the source of his problems and did not recommend therapy until they were performed. He also noted that the claimant's "behavior characteristics" and numerous complaints interfered with his "validity profile."

Dr. Templin examined the claimant on March 26, 2001, at the request of counsel. He diagnosed chronic low back pain syndrome, history of lumbar disc disease, history of C5–6 disc herniation with cord compression, status post interior cervical diskectomy, migraine headaches, and history of cerebral concussion. His March 26, 2001, report indicated that under the Fifth Edition of the *Guides* the claimant had a combined impairment of 25% (combined value charts, page 604). Included in the total were: a Category III cervical impairment of 15% (table 15–5, page 392); a Category II lumbar impairment of 5% (table 15–3, page 384); and 7% impairment for pain (table 18–6, page 584). Dr. Templin also imposed what the ALJ character-

ized as "severe" restrictions on standing, walking, sitting, and lifting.

At the request of the claimant's attorney, Dr. Templin also prepared a supplemental report, which was dated November 30, 2001. It indicated that the previous evaluation was performed under the Fourth Edition of the *Guides* and that if the findings on March 26, 2001, were rated under the Fifth Edition, the claimant's impairment would be 34% (combined value charts, page 604). Included in the total were: 28% for DRE Cervical Category IV (table 15–5, page 392); 3% for the effects of the cervical condition on his ability to engage in activities of daily living (table 1–2, page 599); 5% for DRE Lumbar Category II (table 15–3, page 384); and 3% for lumbar pain (table 18–6, page 584).

The employer offered medical evidence from Dr. Snider, a specialist in occupational and environmental medicine, and from Dr. Travis, a neurosurgeon. Dr. Snider evaluated the claimant in October, 2000, and characterized the case as "exceedingly complex and lengthy." His diagnoses were: lumbosacral contusion and strain; chronic low back pain, status post C5–6 diskectomy and fusion; urogenital complaints without objective abnormality; headaches; intermittent hypertension; bilateral carpal tunnel syndrome and right ulnar neuropathy; right upper extremity tremor; and symptom magnification. He was of the opinion that most of the claimant's problems were unrelated to the fall, and he noted a "fairly significant degree of symptom magnification and some nonanatomical findings." Using the Fifth Edition of the *Guides,* he assigned a 25% cervical impairment (DRE Category IV), 80% of which he characterized as being "pre-existing active and/or dormant," and a 5% lumbar impairment (DRE Category II), 50% of which he attributed to "pre-existing dormant conditions."

Dr. Travis evaluated the claimant in December, 2000. He reported evidence of symptom magnification, noting that the claimant complained of low back pain upon straight leg raising at 15 and 20 degrees when recumbent but that, when sitting on the table and distracted, he did not complain even at 90 degrees. He characterized the sensory examination as "bizarre, nondermatomal, and varied." Using the Fourth Edition of the *Guides*, he assigned a 0% lumbar impairment (DRE Lumbosacral Category 1, page 3/102) and a 5–15% cervical impairment (DRE Cervicothoracic Category II or III, page 3/104), of which 90% was due to the natural aging process or pre-existing spondylotic changes. He would permit the claimant to work without restrictions.

The claimant testified that he experienced constant cervical pain that radiated into his arms and hands and into his head. He rated it at 7 or 8 on a 10-point scale. He also complained of frequent migraine headaches and of lower back pain that radiated into both legs. He maintained that he was unable to return to any gainful employment, including the sales job that his employer had discussed with him.

When the claim was heard, the sole issue to be decided was the extent and duration of disability. After reviewing the lay and medical evidence, the ALJ determined that although the claimant sustained an injury that would decrease his ability to "resume the heaviest employment," he was not totally disabled. Relying upon Dr. Travis, the ALJ determined that the claimant's cervical impairment was 15%, and relying upon Dr. Templin, the ALJ determined that his lumbar impairment was 5%. The income benefit calculation was based upon a 20% impairment.

The claimant petitioned for reconsideration on the ground that Dr. Travis had used the Fourth Edition of the *Guides* when assigning an impairment rating but that the Fifth Edition was in use when his claim was considered. He urged the ALJ to apply the tables in the Fifth Edition and, thereby, to increase the award. In response, the employer pointed out that the claimant did not object to the introduction of Dr. Travis's report or present any evidence to impeach his use of the Fourth Edition. Concluding that the claimant had failed to raise a patent error in the opinion and that an ALJ was not authorized to translate Dr. Travis's findings into a Fifth–Edition impairment, the ALJ overruled the petition.

The Board's majority view was that in the interest of fairness to all parties, a claim should be governed by the latest edition of the *Guides* that was generally available on the date that proof time expired. In those claims where proof time expired before March 1, 2001, use of the Fourth Edition was required. In claims where proof time began after March 1, 2001, use of the Fifth Edition was required. Where proof time spanned March 1, 2001, the majority determined that the ALJ was free to determine the weight and credibility of impairments assigned under both editions. In such a claim, if a physician examined the worker before March 1, 2001, and assigned an impairment under the Fourth Edition, the ALJ was free to rely upon that physician. Likewise, if a physician examined the worker after March 1, 2001, and assigned an impairment under the Fifth Edition, the ALJ was free to rely upon that physician. Because the Fifth Edition of the *Guides* was certified by the commissioner as being generally available before the claim was filed and, therefore, before the time for introducing proof had commenced, the majority determined that the claim must be remanded for an award that was based upon an impairment that was assigned under the Fifth Edition of the *Guides*.

A dissenting opinion expressed the view that testifying physicians should be required to use the latest edition available at the time of their examination or report and should not be required to re-evaluate a worker simply because a new edition of the *Guides* is certified as being generally available. Furthermore, in every claim, the ALJ should be free to determine the weight and credibility of conflicting impairments. The dissent concluded that because Dr. Travis used the latest edition available at the time of his report, the ALJ was free to rely upon his opinion.

In contrast to either opinion at the Board, the Court of Appeals determined that KRS 342.730(1)(b) refers to the edition certified as being generally available "at the time of the ALJ's award." Nonetheless, the Court affirmed, noting that the Fifth Edition was certified as being generally available before the ALJ's award. Appealing, the employer maintains that nothing in KRS 342.730(1)(b) refers to the date on which the "latest edition available" should be determined. It asserts that although the regulations make it clear when the latest edition becomes available, "they do not specify at what point in the claims process the latest edition available should be determined." Noting that KRS 342.730(1)(b) refers to a determination of impairment, the employer points out that an ALJ does not determine impairment but only chooses one from those in evidence. It argues, therefore, that the statute refers to the latest edition available at the time a physician assigns an impairment rating.

■ The First Edition of the *Guides* was published by the American Medical Association in 1971 to provide a standard for measuring the degree of functional impairment caused by injuries and diseases. Since 1972, income benefits for permanent partial disability have been awarded under KRS 342.730(1)(b). As amended effective July 15, 1980, KRS 342.730(1)(b) permitted benefits to be awarded based upon the percentage of "disability" under the 1977 Edition of the *Guides*. 1972 Ky. Acts ch. 104, § 15. The words "latest edition available" appeared effective July 13,1990. 1990 Ky. Acts ch. 17, § 1. At that time, the Third Edition of the *Guides* was the latest available edition, and a worker's entitlement to income benefits was measured under the *Osborne v. Johnson*, Ky., 432 S.W.2d 800 (1968), standard. The Fourth Edition was published in 1993. In 1996, the legislature revised Chapter 342 extensively. It required the use of objective and standardized methods for determining that a harmful change had occurred and severely restricted an ALJ's latitude in determining the extent of permanent partial disability. *See Ira A. Watson Department Store v. Hamilton*, Ky., 34 S.W.3d 48 (2000).

The claimant's injury occurred on January 26, 2000, at which time the formula for calculating a partial disability award under KRS 342.730(1)(b) was as follows:

> For permanent partial disability, sixty-six and two-thirds percent (66–2/3%) of the employee's average weekly wage but not more than seventy-five percent (75%) of the state average weekly wage as determined by KRS 342.740, multiplied by the permanent impairment rating caused by the injury or occupational disease as determined by "Guides to the Evaluation of Permanent Impairment," American Medical Association, latest edition available, times the factor set forth in the table that follows:

| AMA Impairment | Factor |
| --- | --- |
| 0 to 5% | 0.75 |
| 6 to 10% | 1.00 |
| 11 to 15% | 1.25 |
| 16 to 20% | 1.50 |
| 21 to 25% | 1.75 |
| 26 to 30% | 2.00 |
| 31 to 35% | 2.25 |
| 36% and above | 2.50 |

As adopted effective June 27, 2000, 803 KAR 25:010E, § 1(9) provided:

> "Latest available edition" of the [*Guides*] means that edition which the commissioner has certified as being generally available to the department, attorneys, and medical practitioners. The commissioner shall through certification issued to the Workers' Compensation Board, and administrative law judges and posted prominently at the department's hearing sites establish the date upon which a particular edition of the [*Guides*] is applicable for the purposes of Chapter 342.

The commissioner certified that the Fifth Edition of the *Guides* was generally available on March 1, 2001. This claim was filed subsequently, in August, 2001.

■ A partial disability benefit is the product of three factors: 66 23% of the worker's average weekly wage, an AMA impairment that is assigned under the "latest edition available" of the *Guides*, and a statutory factor that increases with impairment. It is undisputed that the impairment for a particular condition may be different using different editions of the *Guides*. Yet, although the amount of a worker's impairment has a two-fold effect on the amount of his income benefit, neither KRS 342.730(1)(b) nor the regulations specify at what point in the history of a claim the latest edition available is to be determined. Among the possibilities are: the date of the injury, the date that the particular impairment is assigned, the date that the worker reaches maximum medical improvement (MMI), the date that proof time expires, or the date of the ALJ's decision. The employer maintains that it would be most reasonable to interpret KRS 342.730(1)(b) as permitting an ALJ to rely on a physician who used the latest edition available at the time the impairment rating was assigned.

Although the version of KRS 342.730(1)(b) that was effective on the date of the claimant's injury governs the calculation of his income benefit, neither party has asserted that the phrase "latest edition available" refers to the latest edition that was available on the date of injury. An impairment rating is assigned when an injured worker recovers to the point that his condition is stable, in other words, to the point that he is at MMI. It is apparent from the frequency with which the *Guides* have been updated and from the increasing size of successive volumes that the art and science of evaluating impairment are continuously evolving. For that reason, we are convinced that the methods prescribed in the most recent edition are likely to be the most accurate and may be used without regard to the date of injury, just as the most recent life expectancy table may be used. *See Stovall v. Great Flame Coal Co.*, Ky.App., 684 S.W.2d 3 (1984). We conclude, therefore, that the use of a Fourth–Edition impairment was not required when calculating the claimant's benefit simply because it was the latest edition available on the date of his injury. We also conclude that because the methods prescribed in the most recent edition are likely to be the most accurate, the impairment from which a benefit is calculated must be based on those methods, regardless of the date of the underlying medical evaluation or the date of MMI.

■ Despite the foregoing conclusions, we are convinced that the legislature did not intend for the applicable edition of the *Guides* to be determined by the date of the ALJ's decision. Under such an interpretation of KRS 342.730(1)(b), proof time would end, the hearing would be held, and the claim would be briefed, all before the parties knew for certain what edition of the *Guides* governed the claim. We conclude, therefore, that the phrase "latest

edition available" refers to the latest edition that has been certified as being generally available as of the date that proof time closes. We have observed many times that one of the purposes of the 1996 amendments was to incorporate more objective standards for awarding income benefits. For that reason, we are convinced that although an ALJ is free to choose among impairments that were assigned under the latest edition available at the closing of proof, an ALJ is not free to rely upon an impairment that was assigned under an earlier edition. Two options are available in instances where proof time spans the date on which a new edition of the *Guides* is certified as being generally available. The ALJ may extend proof time and permit proof to be re-taken under the latest edition where fairness dictates, or the parties may agree to have the claim decided under the previous edition.

■ The employer argues that the claimant failed to object to Dr. Travis's testimony insofar as it addressed his impairment and, therefore, was prohibited from asserting on appeal that the ALJ erred by relying on it. It concludes, therefore, that the Board should not have considered the unpreserved allegation of error. We disagree. Although an impairment that was assigned under an edition other than the latest available may be relevant for other purposes, it is not a proper basis for calculating an income benefit under KRS 342.730(1)(b) absent a stipulation of the parties. Thus, a calculation based on the impairment would not be in conformity with Chapter 342 and would be subject to the Board's review *sua sponte*. *See Whittaker v. Reeder*, Ky., 30 S.W.3d 138 (2000).

Finally, the employer maintains that a remand is unnecessary because there was substantial evidence in the record to support a finding that the claimant's cervical impairment under the Fifth Edition of the *Guides* was 15%. The employer explains that Dr. Templin's March 26, 2001, report indicated that the impairment was assigned using the Fifth Edition of the *Guides* and that all of the table and page references in the report correspond to the Fifth Edition but not to the Fourth Edition. Dr. Templin referred to pages 384, 392, 584, and 604, which the employer asserts could not be references to the 339-page Fourth Edition. Furthermore, Dr. Templin referred to a formal "Pain Related Assessment," a procedure that did not exist under the Fourth Edition. The employer asserts that, despite Dr. Templin's subsequent statement to the contrary, the impairment he assigned on March 26, 2001, was made under the Fifth Edition and was substantial evidence of record to support the ALJ's finding of fact.

■ The employer is correct in its assertion that despite Dr. Templin's subsequent statement, his March 26, 2001, report indicated that the impairment contained therein was assigned under the Fifth Edition of the *Guides*. It may well be true that the report could not possibly have been referring to an impairment that was assigned under the Fourth Edition and that Dr. Templin simply changed his mind about the extent of the claimant's impairment. The fact remains, however, that only an ALJ may judge the weight and credibility of conflicting evidence. *See* KRS 342.285. What is clear is that Dr. Templin's reports conflicted with each other and with the other medical evidence.

■ On remand, the ALJ must reconsider the evidence concerning the claimant's impairment under the Fifth Edition of the *Guides*, choose among the Fifth-Edition impairments in evidence, and base the award upon that impairment. An ALJ is not authorized to interpret the *Guides*. Nonetheless, if the ALJ determines that

an impairment rating cites to tables and page numbers that are not found in the Fourth Edition of the *Guides,* it would be reasonable for the ALJ to conclude that the rating was not made under that edition. Furthermore, if two impairment ratings contain citations to the same tables and page numbers and also state that they were made under the same edition of the *Guides,* the ALJ could reasonably conclude that they probably were. The fact remains, however, that when considering Dr. Templin's medical reports and the other medical evidence, the ALJ could reasonably arrive at a number of different conclusions. It is for that reason that a remand is required. No particular result is compelled except that the claimant's award must be based on an impairment that was assigned under the Fifth Edition of the Guides.

The decision of the Court of Appeals is affirmed.

All concur.