# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: OCTOBER 31, 2019
NOT TO BE PUBLISHED

**Supreme Court of Kentucky**

2018-SC-000593-WC

**FINAL**

**DATE** 11/25/19

GREYHOUND LINES, INC.

APPELLANT

ON REVIEW FROM COURT OF APPEALS

V.                              CASE NO. 2018-CA-000267-WC

WORKERS' COMPENSATION BOARD NO. 13-WC-91370

KERRY SLIDER,                                        APPELLEES
TANYA PULLIN, ADMINISTRATIVE LAW JUDGE,
AND WORKERS' COMPENSATION BOARD

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

The Appellant, Greyhound Lines, requests that this Court reverse the

Court of Appeals' holding in favor of the Appellee, Kerry Slider. After review, we

affirm.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Kerry Slider began working for Greyhound in November 2008 as a bus

driver. Her job duties in addition to driving included loading and unloading

luggage and passengers. On October 11, 2012, Kerry was using her bus's

mechanical lift to unload an overweight passenger in a wheelchair. As the

passenger was getting onto the lift, the lift suddenly dropped about a foot,

causing the passenger's chair to begin falling forward. Kerry grabbed the

wheelchair to prevent the passenger from falling eight feet to the concrete

below. When she did, she felt a sudden, severe pain in her upper back that

radiated through her right arm. She was unable to continue unloading the passenger and went to the emergency room later that day.

Kerry was diagnosed with scapular muscle detachment[1] and underwent two surgeries. The first, performed by Dr. Ben Kibler on June 18, 2014, was a scapular muscle reattachment surgery. Following the first surgery she was diagnosed with postoperative adhesive capsulitis.[2] Because of this, Dr. Kibler also performed a follow up procedure in June 2015: a manipulation under anesthesia on Kerry's right shoulder joint to improve her range of motion.

Kerry filed a workers' compensation claim, and a formal hearing on the claim was held in April 2017. Administrative Law Judge Tanya Pullin presided. ALJ Pullin's Opinion noted the following medical evidence:

## A. **Dr. Thomas Loeb**

Dr. Loeb performed an independent medical exam (IME) on Kerry in February 2015, after her reattachment surgery but prior to the manipulation under anesthesia procedure. Dr. Loeb discussed the work injury with Kerry, reviewed her medical records, and did a physical examination.

Dr. Loeb assigned Kerry an impairment rating using the American Medical Association's *Guides to the Evaluation of Permanent Impairment*, Fifth

---

[1] Scapular muscle detachment is the traumatic detachment of the rhomboid muscles and/or lower trapezius muscle from the medial border of the shoulder blade. https://www.shoulderdoc.co.uk/article/1685. (September 2019).

[2] Also known as frozen shoulder, "adhesive capsulitis, is a condition characterized by stiffness and pain in the shoulder joint." https://www.mayoclinic.org/diseases-conditions/frozen-shoulder/symptoms-causes/syc-20372684. (September 2019).

Edition (*Guides*). He assigned her a 26% upper extremity impairment rating, which converted to a 16% whole person impairment (WPI) rating. He did not examine Kerry again after she underwent the joint manipulation procedure.

### B. **Dr. Kibler**

Dr. Kibler treated Kerry numerous times for two years following her work injury. As already mentioned, he also performed her reattachment surgery and manipulation procedure.

On May 19, 2016, Dr. Kibler assigned Kerry a 12% impairment rating based on her diagnosis and a 6% impairment rating due to muscle weakness, totaling an 18% upper extremity impairment. He converted this to an 11% WPI rating. His report did not cite the pages from the *Guides* on which he based his findings.

### C. **Dr. Jeffrey Fadel**

Dr. Fadel conducted an IME on Kerry in March 2015. He took a history from Kerry, reviewed her medical records, and did a physical examination. Using the *Guides* he assigned her a 14% upper body impairment rating, which translated to a WPI rating of 8%. His report noted that the *Guides* do not allow a physician to "include weakness as a ratable part of [Kerry's] pathological process when the joint has motion loss."

### D. **Dr. Frank Bonnarens**

Dr. Bonnarens performed an IME in February 2016. He discussed Kerry's medical history with her, reviewed her medical records, and conducted

a physical examination. He assigned an 8% upper extremity impairment which translated to a 5% WPI under the *Guides*.

Based on the evidence and testimony, ALJ Pullin made the following findings regarding Kerry's impairment rating:

> In this specific instance after careful review of the lay and medical testimony, the ALJ finds persuasive the opinion of Dr. Kibler and finds Plaintiff retains an 11% functional impairment rating pursuant to the *Guides* as a result of her October 11, 2012 work-related injury to her right upper extremity. Pursuant to KRS[3] 342.730(1)(b), the functional impairment is multiplied by a factor of 1 yielding an 11% impairment partial disability award.
>
> While all medical opinions have been considered by the ALJ...the opinion of Dr. Kibler was the most persuasive to the ALJ because he treated Plaintiff on numerous occasions. These multiple encounters, as well as the surgery which Dr. Kibler performed, gave Dr. Kibler a better and more informed vantage point from which to assess Plaintiff's injury and impairment than the other evaluating physicians had. While in his IME report Dr. Kibler did not cite the page numbers of the *Guides*, which he used to determine an impairment rating for muscle weakness, the *Guides* do allow for additional impairment rating for loss of strength to the upper extremity and instruct the practitioner on pages 507 through 511. The *Guides* note, "In a rare case, if the examiner believes the individual's loss of strength represents an impairing factor that has not been considered adequately by other methods in the *Guides*, the loss of strength may be rated separately." This Dr. Kibler has done. Because Dr. Kibler did extensive treatment of Plaintiff and consequently has considerable knowledge and understanding of Plaintiff's condition, the ALJ finds that this can be the "rare case" in which the examiner has determined that loss of strength represents an

---

[3] Kentucky Revised Statute.

impairing factor that had not otherwise been considered.

Greyhound filed a petition for reconsideration of ALJ Pullin's findings, but it was denied. Greyhound then challenged ALJ Pullin's findings to the Workers' Compensation Board (Board). Greyhound's arguments to the Board were threefold. First, Dr. Kibler's impairment rating could not be relied on by ALJ Pullin because the *Guides* absolutely prohibit rating loss of strength when decreased range of motion has been rated for the same joint. Second, Dr. Kibler's medical report was insufficient to support the inferences ALJ Pullin made to justify Dr. Kibler's impairment rating. And finally, assuming arguendo that loss of strength and decreased range of motion can be combined, Dr. Kibler's calculation was flawed: under the combined values chart a 12% and 6% upper extremity impairment combines for a 17% upper extremity impairment, not 18% as Dr. Kibler found. Therefore, Kerry's WPI rating would be 10%, not 11%.

The Board agreed that Dr. Kibler erred in his calculation and lowered Kerry's WPI rating to 10%. However, the Board disagreed with Greyhound's other two arguments. To begin, the Board agreed with ALJ Pullin that *Guides* do not strictly prohibit the inclusion of a rating for a loss of strength when decreased range of motion has been rated, as the passage at issue states:

> **In a rare case, if the examiner believes the individual's loss of strength represents an impairing factor that has not been considered adequately by other methods in the Guides, the loss of strength may be rated separately.** An example of this situation would be loss of strength due to a severe muscle tear that healed leaving a palpable muscle defect. If the

5

examiner judges that loss of strength should be rated separately in an extremity that presents other impairments, the impairment due to loss of strength could be combined with the other impairments, only if based on unrelated etiologic or pathomechanical causes. Otherwise, the impairment ratings based on objective anatomic findings take precedence. Decreased strength cannot be rated in the presence of decreased motion, painful conditions, deformities, or absence of parts (eg, thumb amputation) that prevent effective application of maximal force in the region being evaluated.[4]

Further, it discussed that the proper way to challenge a doctor's impairment rating is to present medical testimony concerning the impropriety of the rating or to cross-examine the doctor. Here, no other physician directly criticized Dr. Kibler's rating, and Greyhound did not object to the admission of his opinion. And, while it is true Dr. Fadel noted he would not assign additional impairment based on weakness, his reports were not offered for the purpose of contradicting Dr. Kibler's opinion. Therefore, Dr. Kibler and Dr. Fadel's opinions constituted conflicting opinions under the *Guides*. And it was ALJ Pullin's function as factfinder to weigh the evidence and select which rating would be the basis for awarding permanent disability benefits.[5]

Finally, the Board discussed that, while ALJs are not permitted to independently interpret the *Guides*, they may consult them in the process of assigning weight and credibility to evidence.[6] It held that ALJ Pullin appeared

---

[4] *Guides*, Section 16.8a, pg. 508.

[5] Citing *Knott Cnty. Nursing Home v. Wallen*, 74 S.W.3d 706 (Ky. 2002).

[6] Citing *George Humfleet Mobile Homes v. Christman*, 125 S.W.3d 288 (Ky. 2004).

6

to limit her review of the *Guides* to the role of assisting her to determine the credibility of the physicians. Accordingly, apart from the WPI rating, the Board affirmed ALJ Pullin's opinion. Greyhound then appealed the Board's opinion to the Court of Appeals.

The Court of Appeals affirmed the Board. It held that, because the *Guides* do not absolutely prohibit the inclusion of a rating for a loss of strength, the Board had not overlooked or misconstrued controlling law or so flagrantly erred that it caused gross injustice.[7] Therefore, the Court of Appeals had no grounds to overrule it.

Greyhound now appeals to this Court. Its sole argument is that both the Board and the Court of Appeals erred in affirming ALJ Pullin because she went beyond her authority to weigh the opinions and credibility of the medical experts and substituted her own medical reasoning and analysis in place of a medical opinion.

## II. ANALYSIS

In *W. Baptist Hosp. v. Kelly*,[8] this Court set forth our standard of review in workers' compensation cases:

> The [Board] is entitled to the same deference for its appellate decisions as we intend when we exercise discretionary review of Kentucky Court of Appeals decisions in cases that originate in circuit court. The function of further review of the [Board] in the Court of Appeals is to correct the Board only where the Court perceives the Board has overlooked or misconstrued

---

[7] *Greyhound Lines, Inc. v. Slider*, 2018-CA-000267-WC, 2018 WL 4682422, at *3 (Ky. App. Sept. 28, 2018).

[8] 827 S.W.2d 685 (Ky. 1992).

controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice. The function of further review in our Court is to address new or novel questions of statutory construction, or to reconsider precedent when such appears necessary, or to review a question of constitutional magnitude.

*Id.* at 687-88. In addition,

The standard of review with regard to a judicial appeal of an administrative decision is limited to determining whether the decision was erroneous as a matter of law. Although a party may note evidence which would have supported a conclusion contrary to the ALJ's decision, such evidence is not an adequate basis for reversal on appeal. The crux of the inquiry on appeal is whether the finding which was made is so unreasonable under the evidence that it must be viewed as erroneous as a matter of law.[9]

Based on the record before us, we find no basis to reverse the Court of Appeals or, by extension, the Board.

First, we agree with the Board's analysis concluding that Greyhound is arguing against medical evidence that it failed to properly dispute during the ALJ hearing. Greyhound asserts that the method used by Dr. Kibler in assigning Kerry's impairment rating, i.e. assigning an impairment rating based on loss of strength, is never under any circumstances permitted by the *Guides*. It therefore had numerous avenues to dispute Dr. Kibler's opinion before the ALJ: it could have objected to the admission of the opinion, presented medical testimony regarding the impropriety of Dr. Kibler's rating, and/or cross-

---

[9] *Ira A. Watson Dept. Store v. Hamilton*, 34 S.W.3d 48, 52 (Ky. 2000).

8

examined Dr. Kibler. Greyhound made no attempt to go down any of these potential avenues. Even Dr. Fadel's testimony, which supported Greyhound's argument that the *Guides* do not allow muscle weakness to be included as a ratable portion when the joint has ratable motion loss, was not presented by Greyhound for the specific purpose of refuting Dr. Kibler's method of assigning Kerry's impairment rating.

Therefore, all the evidence from Kerry's treating physicians simply constituted conflicting medical opinions. It is well established that when there is conflicting medical evidence "the question of which evidence to believe is the **exclusive** province of the ALJ."[10] In this case, ALJ Pullin found Dr. Kibler's opinion more credible than the other medical evidence. She supported this by noting that Dr. Kibler treated Kerry more than the other physicians and that those "multiple encounters, as well as the surgery which Dr. Kibler performed, gave Dr. Kibler a better and more informed vantage point from which to assess Plaintiff's injury and impairment than the other evaluating physicians had." This was a well-reasoned conclusion that was within her statutory discretion to make.

Moreover, this Court disagrees with Greyhound's argument that ALJ Pullin went beyond her authority to weigh the opinions and credibility of the medical experts and substituted her own medical reasoning and analysis in

---

[10] *Square D Co. v. Tipton*, 862 S.W.2d 308, 309 (Ky. 1993) (emphasis added).

9

place of a medical opinion. Greyhound insists this must be so because Dr. Kibler's impairment rating, which was provided on a standard Medical Form 107, did not state that his impairment ratings were determined pursuant to the *Guides*. And further, Dr. Kibler did not cite any page or table numbers in association with his impairment ratings.

The record reveals that Greyhound's first supporting argument is plainly incorrect. Dr. Kibler's Form 107 medical report clearly states under a subsection titled "Impairment" that "Using the most recent AMA Guides to the Evaluation of Permanent Impairment, the plaintiff's permanent whole person impairment is 11%." Under the same subsection Dr. Kibler wrote: "12% due to diagnosis – [illegible] GH instability; 6% due to muscle weakness; 18% = 11% to body." Clearly, Dr. Kibler determined his impairment rating using the *Guides*.

Finally, we do not perceive that ALJ Pullin "went beyond her authority to weigh the opinions and credibility of the medical experts and substituted her own medical reasoning and analysis in place of a medical opinion" simply because no page numbers were provided by Dr. Kibler. Instead, it appears that ALJ Pullin used common sense to discern that, since Dr. Kibler assigned an impairment rating due to muscle weakness, he must have done so using the only portion of the *Guides* that permits assigning an impairment rating due to muscle weakness. She in fact cited that section of the *Guides* in her opinion to demonstrate that the *Guides* allow for assigning an impairment rating due to muscle weakness "in a rare case." She found that Dr. Kibler did just that, and we cannot hold that in so doing she made a finding "so unreasonable under the

10

evidence that it must be viewed as erroneous as a matter of law." Accordingly, we affirm the Court of Appeals.

### III. CONCLUSION

Based on the foregoing, we affirm the Court of Appeals and hold that ALJ Pullin did not commit reversible error by exercising her statutory discretion in choosing to credit Dr. Kibler's impairment rating over that of Kerry's other treating physicians.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Douglas Anthony U'Sellis
U'Sellis, Mayer, & Associates, PSC
Louisville, KY

COUNSEL FOR APPELLEE:

John Warren Spies
Morgan & Morgan, PLLC
Louisville, KY